[No. 67948-7. En Banc.]
Argued January 11, 2000. Decided April 6, 2000.

THE STATE OF WASHINGTON, *Respondent,* v. MIHAI BOBIC, *Petitioner.*

THE STATE OF WASHINGTON, *Respondent,* v. IGOR STEPCHUK, *Petitioner.*

*Nielsen, Broman & Associates, P.L.L.C.*, by *James R. Dixon*, for petitioner Bobic.

*Stella Paterson* and *Nancy P. Collins*, for petitioner Stepchuk.

*Norm Maleng, Prosecuting Attorney*, and *Susan K. Storey* and *Charles P. Sainsbury, Deputies*, for respondent.

TALMADGE, J. — We are asked in this case to determine whether an officer's warrantless search of a commercial storage unit was constitutional when the search was made through a small, preexisting hole in an adjoining storage unit. We must also determine if the State properly charged defendants Mihai Bobic and Igor Stepchuk with multiple counts of conspiracy in the face of their double jeopardy challenge. The defendants assert they were guilty of a single conspiracy with multiple criminal objectives rather than three conspiracies, each associated with the separate underlying crimes with which they were charged.

Under the circumstances of this case, we agree the evidence the officers obtained from the storage unit was in open view. We further conclude the unit of prosecution for conspiracy under Washington law is an agreement and a substantial step in furtherance of the agreement. However, since the evidence here reveals only a single sophisticated criminal conspiracy, albeit with several criminal objectives, we find the defendants were guilty of only a single count of conspiracy.

## ISSUES

1. When an officer is admitted legally into a neighbor-

ing commercial storage unit and views items of property in another unit, without a warrant, but through a preexisting hole in the neighboring unit's wall, are the items in open view?

2. Do three separate conspiracy convictions for each of the separate criminal objects ·of a conspiracy violate state and federal constitutional double jeopardy provisions?

## FACTS

Mihai Bobic and Igor Stepchuk were charged with numerous crimes arising from a sophisticated auto theft conspiracy. Bobic, Stepchuk, or their confederates stole vehicles and stripped them of their contents and key parts. They stored the stolen car parts and other stolen goods in various commercial storage facilities. Insurance carriers subsequently sold the hulks of the cars left by the thieves at auto auctions. Bobic, Stepchuk, or their confederates then purchased the hulks at those auto auctions, giving them clear title to the vehicles. They then reassembled the vehicles with the stolen car parts and sold them.

Detective Kelly Quirin became suspicious about certain auto thefts and his investigation uncovered a possible connection between auto thefts and storage facilities. On March 1, 1994, Quirin obtained and executed a search warrant to examine certain units at a Shurgard Storage facility. After searching the units in accordance with the warrant, the facility's manager told Quirin that one of the units at his facility, unit E-71, might be connected with stolen vehicles. This unit was being rented by Almaz Sebesebie. On March 8, Quirin went to the storage facility with another officer and asked to look at unit E-71, which was locked. The manager let the officers into an unrented, unlocked storage unit next door to unit E-71. Upon entering the unit, the officers saw a preexisting hole, "maybe big enough to stick your pinky finger in or a little bigger," about four feet off the ground. Verbatim Report of Proceedings (Mar. 25, 1995) at 101. (The walls of the units go up to

the ceiling.) Quirin looked through the hole, and without aid of a flashlight was able to see items in unit E-71. Based on this information, Quirin obtained a search warrant for unit E-71 and recovered stolen goods.

Stepchuk was subsequently charged with seven counts of first degree theft, eight counts of possession of stolen property in the first degree, and three counts of conspiracy based on each of the substantive crimes. Bobic was similarly charged with eight counts of first degree theft, eight counts of possession of stolen property, one count of trafficking in stolen property in the first degree, and the conspiracy charges. Prior to trial, Bobic moved to suppress the evidence recovered during the search of unit E-71. During his pretrial suppression hearing, Bobic testified unit E-71 was rented by Almaz Sebesebie for Paul Pedrik, a friend of Bobic. However, Bobic placed a lock on the door. Almaz Sebesebie signed the rental agreement for unit E-71; no other person was listed as an additionally authorized entrant. The agreement permitted the manager to open a unit at any time to uncover illegal activities.[1] Although the trial court, the Honorable Marilyn Sellers, determined Quirin conducted a warrantless search when he looked through

---

[1]The rental agreement states, in pertinent part:

2. USE OF PREMISES. The Storage Unit is for the storage of property only, and may not be used for residential purposes, to house live animals, or to store anything that is a health hazard, including perishable food items. The Storage Unit may not be used for any unlawful purpose or in violation of zoning, business license, or other regulatory restrictions, nor will Tenant keep in the Storage Unit any explosive or highly flammable materials, hazardous materials, toxic chemicals, gasoline, or substances whose storage or use is regulated or prohibited by local, state or federal law or regulation . . . . Tenant may not conduct any business or commercial transactions in or about the Storage Unit . . . . Tenant shall give the Landlord permission to enter the Storage Unit at any time for the purpose of removing and disposing of any property in the Storage Unit in violation of this provision. . . . Tenant represents to Landlord that all personal property to be stored by Tenant in the Storage Unit will belong to Tenant only, and not to any third parties. . . .

. . . .

9. MISCELLANEOUS. Tenant may not assign this Lease or any part of it and may not sublet the whole or any portion of the Storage Unit without the prior written approval of Landlord.

Ex. 20.

the hole in the wall, it denied Bobic's motion to suppress, finding he lacked standing to challenge the search.

After a lengthy trial in King County Superior Court, Bobic and Stepchuk were convicted of conspiracy to commit first degree theft, conspiracy to commit first degree possession of stolen property, and conspiracy to commit first degree trafficking in stolen property. Bobic was also convicted of six of eight counts of first degree possession of stolen property; Stepchuk was convicted of five of eight counts of possession of stolen property. Because the crimes were found to be major economic offenses, both men received exceptional sentences, which they have served.

Both men appealed their convictions, alleging for the first time the convictions violated their rights under state and federal double jeopardy constitutional principles. In the alternative, they contended their conspiracy convictions constituted the same criminal conduct and should have been counted as one offense for the purposes of computing their offender scores.[2] Stepchuk separately appealed his possession of stolen property convictions, alleging insufficient evidence supported his conviction. Bobic also appealed the lower court's denial of both his motion to suppress evidence seized from unit E-71 and his motion to suppress identification based on two photo montages.

The Court of Appeals, Division One, affirmed the trial court decision, holding the multiple conspiracy counts did not violate the defendants' double jeopardy rights. *State v. Bobic*, 94 Wn. App. 702, 711, 972 P.2d 955 (1999). Contrary to the trial court decision, the Court of Appeals determined Bobic had automatic standing to challenge the search. *Bobic*, 94 Wn. App. at 713. But, it determined there was no "search" because the items in the unit were in "open view." *Id.* at 714. Moreover, the court found the photo montages were not improper.

Bobic and Stepchuk filed separate petitions for review

---

[2]The defendants also contended the trial court erred in imposing sentences that exceeded the statutory maximum for their conspiracy to traffic in stolen property convictions, and the State conceded this error. Br. of Resp't at 47-48.

under the same case number as to the double jeopardy issues and the search of the storage unit, which we granted.

## ANALYSIS

### A. Procedural Issues

■ Both the State and the defendants assert procedural reasons foreclose our consideration of various issues in this case. The State notes that neither Bobic nor Stepchuk raised the double jeopardy issue before the trial court. Generally, courts will not consider issues raised for the first time on appeal. RAP 2.5(a). However, RAP 2.5(a)(3)[3] is an exception to the general rule that parties cannot raise new arguments on appeal; we construe this exception narrowly by requiring the asserted error to be " 'manifest'—*i.e.*, it must be 'truly of constitutional magnitude.' " *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995) (quoting *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988)); *see also State v. WWJ Corp.*, 138 Wn.2d 595, 602, 980 P.2d 1257 (1999) (closely scrutinizing claims for manifest error). The double jeopardy claims Bobic and Stepchuk raise meet this test. *See State v. Clark*, 139 Wn.2d 152, 156, 985 P.2d 377 (1999).

■ Bobic also asserts the State failed to properly preserve the open view issue below because it did not cross-appeal from the trial court's finding that Quirin's actions, in viewing the items in unit E-71 through a peephole, unreasonably invaded Bobic's privacy interest. Bobic's Pet. for Review at 3. We disagree. The State prevailed on the suppression motion. As a respondent, the State was not obliged to cross-appeal because it sought no further affirmative relief from the Court of Appeals. RAP 2.4(a), 5.1(d). *See also In re Arbitration of Doyle*, 93 Wn. App. 120, 123, 966 P.2d 1279 (1998) (notice of cross-appeal is essential if the respondent seeks affirmative relief as distinguished

---

[3]RAP 2.5(a) states, in pertinent part: ". . . a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right."

from urging additional grounds for affirmance); 3 Lewis H. Orland & Karl B. Tegland, Washington Practice: Rules Practice 48 (5th ed. 1998). It was entitled to argue any grounds supported by the record to sustain the trial court's order. *See Davis v. Niagara Mach. Co.*, 90 Wn.2d 342, 348, 581 P.2d 1344 (1978); *Ertman v. City of Olympia*, 95 Wn.2d 105, 621 P.2d 724 (1980); *Tropiano v. City of Tacoma*, 105 Wn.2d 873, 876, 718 P.2d 801 (1986). Thus, the open view issue is properly before us.

## B. Bobic's Challenge to the Search of Storage Unit E-71

 Washington's constitution provides that "[n]o person shall be disturbed in his private affairs, . . . without authority of law." Const. art. I, § 7. A violation of this right turns on whether the State has unreasonably intruded into a person's private affairs. *State v. Boland*, 115 Wn.2d 571, 577, 800 P.2d 1112 (1990). In contrast, a search occurs under the Fourth Amendment if the government intrudes upon a reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). Thus, Washington's "private affairs inquiry" is broader than the Fourth Amendment's "reasonable expectation of privacy inquiry." *State v. Goucher*, 124 Wn.2d 778, 782, 881 P.2d 210 (1994).

The trial court found Bobic had no standing to raise this issue despite the concept of automatic standing articulated in *State v. Simpson*, 95 Wn.2d 170, 181, 622 P.2d 1199 (1980), and *State v. Carter*, 127 Wn.2d 836, 849-50, 904 P.2d 290 (1995). In contrast, the Court of Appeals held Bobic had standing, but that the evidence in the storage unit was in open view. The State did not file a cross-petition for review on the issue of automatic standing; thus, the only issue before us is whether the evidence was in open view. RAP 13.4(d); 13.7(b). *See Tuerk v. Department of Licensing*, 123 Wn.2d 120, 124, 864 P.2d 1382 (1994); *see also Estate of Jordan v. Hartford Accident & Indem. Co.*, 120 Wn.2d 490, 496, 844 P.2d 403 (1993) (citing to RAP 13.7(b)).

 Detective Quirin's observations do not constitute

a search because the objects under observation were in "open view." Under the open view doctrine, "when a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a 'search'[.]" *State v. Rose*, 128 Wn.2d 388, 392, 909 P.2d 280 (1996). Here, the detective was lawfully inside the adjoining unit because the manager had given him permission to enter. Furthermore, it appears from the record that the detective's observations were made without extraordinary or invasive means and could be seen by anyone renting the unit. Verbatim Report of Proceedings (Sept. 25, 1995) at 101 (detective able to "look in[to the hole] with one eye"), Verbatim Report of Proceedings (Sept. 25, 1995) at 102 (not utilizing a flashlight because "[t]he hole wasn't big enough to be able to look at to have the flashlight and your eye next to it to see in.").

Bobic contends the search here must nonetheless fail because it invaded a protected privacy interest and was more intrusive than the search in *Rose*. In *Rose*, the officer's search was likely *more* intrusive because he looked with the aid of a flashlight through a window into the defendant's residence during the evening. *Rose*, 128 Wn.2d at 390. Here, the detective did not peer through a curtained window; he did not wait until something incriminating came into sight or hearing; and he did not attempt to create a better vantage point. *See State v. Seagull*, 95 Wn.2d 898, 632 P.2d 44 (1981).

■ Moreover, a commercial storage unit is not the kind of location entitled to special privacy protection.[4] For example, a person's home is entitled to "heightened constitutional protection" relative to other locations. *State*

---

[4]Indeed, Bobic had a minimal privacy interest in the storage unit. The unit was, in fact, rented by Almaz Sebesebie, not Bobic. Furthermore, he was not an authorized entrant into the unit. Thus, if anyone's private affairs were intruded upon by the detective, it would be Almaz Sebesebie's private affairs, not Bobic's. Moreover, under the lease agreement, the landlord had nearly unfettered discretion to enter the unit to remove and dispose of property improperly placed there. It is difficult to see a privacy interest for Bobic, given the number of people who had the right to enter the unit at their discretion.

*v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994). *See also City of Tukwila v. Nalder*, 53 Wn. App. 746, 770 P.2d 670 (1989) (finding search of a toilet stall offensive because society recognizes a reasonable expectation of privacy in those bodily functions which take place in a bathroom stall). We decline to determine that a commercial storage unit has any special protected status.

This case is analogous to *United States v. Hufford*, 539 F.2d 32, *cert. denied*, 429 U.S. 1002, 97 S. Ct. 533, 50 L. Ed. 2d 614 (1976). In that case, federal agents entered an adjacent rental garage with the renter's permission. *Id.* at 33. Through a crack in the wall and a missing piece of sheetrock, the agents observed a variety of drug manufacturing paraphernalia and amphetamines. *Id.* The United States Court of Appeals for the Ninth Circuit held the agents' view was permissible because the agents did not trespass on the property, they entered the stall with the renter's permission, and the contraband was in plain view. Here, the trial court properly denied Bobic's motion to suppress.

## C. Double Jeopardy

The Double Jeopardy Clause of the United States Constitution guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Fifth Amendment applies to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). The Double Jeopardy Clause encompasses three separate constitutional provisions, one of which protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969); *see also State v. Calle*, 125 Wn.2d 769, 772, 888 P.2d 155 (1995) (same). The Washington Constitution similarly states: "No person shall be . . . twice put in jeopardy for the same offense." CONST. art. I, § 9. Washington's rule offers the same protection as the federal Double Jeopardy Clause. *State v. Gocken*, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995).

Traditionally, we have applied the "same evidence"[5] test in determining whether a defendant was punished multiple times for the same offense. *Calle*, 125 Wn.2d at 777. Under this test, double jeopardy is violated if a defendant is convicted of offenses that are the same in law and in fact. *Id*. at 777-78. But, when a "defendant is convicted for violating one statute multiple times, the same evidence test will *never* be satisfied." *State v. Adel*, 136 Wn.2d 629, 633, 965 P.2d 1072 (1998) (emphasis added). Thus, these tests apply only if a defendant has multiple convictions for violating *several* statutory provisions.[6] *See id*. (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

In contrast, Bobic and Stepchuk were charged with three counts of conspiracy, each under the same conspiracy statute, for acts arising from a single, ongoing, multiobjective agreement. Because the violations are of a single statute, we will not analyze this case under *Blockburger. See United States v. Montgomery*, 150 F.3d 983, 990, *cert. denied*, 525 U.S. 917, 119 S. Ct. 267, 142 L. Ed. 2d 220 (1998); *Adel*, 136 Wn.2d at 633 (declining to apply the "same evidence" test where there was only a single violation of a single statute). Instead, the proper inquiry is "what 'unit of prosecution' has the Legislature intended as the punishable act under the specific criminal statute." *Adel*, 136 Wn.2d at 634 (citing *Bell v. United States*, 349 U.S. 81, 83, 75 S. Ct. 620, 99 L. Ed. 905 (1955)). "When the Legislature defines the scope of a criminal act (the unit of prosecution), double jeopardy protects a defendant from being convicted twice under the same statute for committing just one unit of the crime." *Id*. at 634. If there is any ambiguity, then

---

[5]The "same evidence" test is similar to the "same elements" test adopted in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932); *State v. Gocken*, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995).

[6]In *Braverman v. United States*, 317 U.S. 49, 54, 63 S. Ct. 99, 87 L. Ed. 23 (1942), the Supreme Court distinguished *Blockburger*, noting that a single, multiobjective agreement that violates a federal statute involves a different analysis than a single agreement that violates multiple statues.

"the ambiguity should be construed in favor of lenity." *Id.* at 634-35 (citing *Bell*, 349 U.S. at 84).

Both the defendants and the State take contrary positions regarding the unit of prosecution the Legislature intended to punish under Washington's conspiracy statute, which states in pertinent part:

> A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

RCW 9A.28.040(1).

The defendants argue their conspiracy convictions violate double jeopardy principles because the convictions arise from a single agreement to engage in a criminal enterprise. They rely on *Braverman v. United States*, 317 U.S. 49, 63 S. Ct. 99, 87 L. Ed. 23 (1942), to support their contention that a court cannot impose multiple punishments for what the Legislature intended to be one offense. In *Braverman*, the defendants were charged with conspiracy to violate several separate and distinct internal revenue liquor rules. *Id.* at 50. The defendants argued they could be punished only for one violation of the federal conspiracy statute since the proof established only a single agreement to commit multiple acts violating several statutes. *Id.* at 51. The Supreme Court agreed, holding that where there is a single agreement violating several provisions of a single statute, only a single penalty can be imposed under the federal conspiracy statute, no matter how diverse the objectives of the agreement:

> The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute, § 37 of the Criminal Code. For such a violation, only the single penalty prescribed by the statute can be imposed.

*Id.* at 54. Bobic and Stepchuk argue their single agreement—to steal, strip, repurchase, and resell the vehicles

for profit—constitutes a single violation of the state conspiracy statute, regardless of the number of criminal objects of their agreement.

In contrast, the State contends RCW 9A.28.040(1) requires it to prove a single, specific underlying crime; thus, the Legislature intended to punish separately each individual criminal object of the agreement. Additionally, the State argues RCW 9A.28.040(3) indicates the Legislature's intent to separately punish each criminal object of a conspiracy because the class of the conspiracy depends on the class of the criminal object. For instance, criminal conspiracy is a "Class A felony when an object of the conspiratorial agreement is murder in the first degree[,]" RCW 9A.28.040(3)(a), but it is a "Class B felony when an object of the conspiratorial agreement is a class A felony other than murder in the first degree[.]" RCW 9A.28.040(3)(b). The State also notes the specification of the criminal object is an element of the crime, citing *State v. Smith*, 131 Wn.2d 258, 930 P.2d 917 (1997).

Initially, the Court of Appeals seemed to agree with Bobic and Stepchuk, noting "[t]he federal conspiracy statute and Washington's conspiracy statute are very similar." *Bobic*, 94 Wn. App. at 709. However, it also recognized "the statute could be interpreted in a manner consistent with the State's interpretation[.]" *Id.* at 710. In the end, because of alleged procedural errors by the defendants, the Court of Appeals did not determine which definition of the offense prevailed. *Id.*

In a unit of prosecution case, the first step is to analyze the statute in question. *Adel*, 136 Wn.2d at 632. Although the focus of RCW 9A.28.040(1) appears to be on the conspiratorial agreement, it does not clearly indicate whether the Legislature intended to punish a defendant multiple times for committing a single conspiracy with multiple objectives.

We turn next to the statute's history. Washington's present conspiracy statute is remarkably similar to the federal statute construed in *Braverman*. Washington's original con-

spiracy statute was enacted in 1909, during a regular session of the Legislature. LAWS OF 1909, ch. 249, § 130, at 928; REM. REV. STAT. § 382. In 1975, the Legislature repealed RCW 9.22.010, added Title 9A RCW, and created a new section of the criminal code, RCW 9A.28.040. LAWS OF 1975, 1st Ex. Sess., ch. 260, § 49 at 860; LAWS OF 1975, 1st Ex. Sess., ch. 260, at 833. The current law repealed several specific conspiracy statutes and instead created a general statute. As we noted in *State v. Carroll*, 81 Wn.2d 95, 109, 500 P.2d 115 (1972), "[the former] RCW 9.22.040 was taken directly from the federal statute, 18 U.S.C.A. § 371, which has been the law for many years." Because our law was taken "substantially verbatim" from the federal statute, it carries the same construction as the federal law and the same interpretation as federal case law. *Id.* ("The identical question has been litigated many times in the federal courts. It is the rule that a statute adopted from another jurisdiction will carry the construction placed upon such statute by the other jurisdiction.").

■ Furthermore, when our Legislature enacts a statute, it is presumed to be familiar with judicial interpretations of statutes and, absent an indication it intended to overrule a particular interpretation, amendments are presumed to be consistent with previous judicial decisions. *See, e.g., In re Marriage of Williams*, 115 Wn.2d 202, 208, 796 P.2d 421 (1990). *See also Friends of Snoqualmie Valley v. King County Boundary Review Bd.*, 118 Wn.2d 488, 496, 825 P.2d 300 (1992) (noting the Legislature is presumed to be aware of judicial interpretations of its enactments).

No mention is made anywhere in the legislative history of this statute that the Legislature intended to depart from the federal interpretation proffered in *Braverman*. In *Braverman*, the Supreme Court noted the appropriate focus of review in a conspiracy count is the agreement, not the criminal object:

[T]he precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agree-

ment is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.

*Braverman*, 317 U.S. at 53; *see also United States v. Alerta*, 96 F.3d 1230, 1239 (9th Cir. 1996) (indictment contained duplicate charges because it charged two conspiracies and the first charge was just one part of overall drug distribution scheme and the second charge was a violation of general conspiracy statute). Thus, the federal conspiracy statute intends to punish only the conspiratorial *agreement*, no matter how many criminal objectives are involved.

Likewise, the appropriate focus in Washington is on the conspiratorial agreement, not the specific criminal object or objects. *See State v. Moavenzadeh*, 135 Wn.2d 359, 364, 956 P.2d 1097 (1998) (essential elements of a conspiracy are "an agreement to commit a crime and taking a 'substantial step' toward the completion of that agreement."). *See also State v. Miller*, 131 Wn.2d 78, 86, 929 P.2d 372 (1997) (noting a charge that does not connect a defendant with a coconspirator is not maintainable under Washington's conspiracy statute). Additionally, conspiracy is an inchoate crime. To obtain a conviction, all a prosecutor needs to prove is that the conspirators agreed to undertake a criminal scheme and that they took a substantial step in furtherance of the conspiracy. *State v. Dent*, 123 Wn.2d 467, 476, 869 P.2d 392 (1994) (citing Ira P. Robbins, *Double Inchoate Crimes*, 26 HARV. J. ON LEGIS. 1, 27-29 (1989)). The defendant need not commit any other crime. *Id.* at 476 ("explaining that '[i]f the agreement has been established but the object has not been attained, virtually any act will satisfy the overt act requirement' " (quoting 2 WAYNE R. LAFAVE & AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW § 6.5, at 95 (2d ed. 1986))).

Considering the Legislature is presumed to be familiar with its rules, its prior legislation, and prior court decisions pertaining to double jeopardy, we conclude the

Legislature intended the unit of prosecution for conspiracy, within the meaning of double jeopardy, to be an agreement and an overt act rather than the specific criminal objects of the conspiracy.

The analysis of legislative intent does not end our unit of prosecution analysis, however. Of necessity, a factual analysis as to the unit of prosecution is necessary because even where the Legislature has expressed its view on the unit of prosecution, the facts in a particular case may reveal more than one "unit of prosecution" is present. *Adel*, 136 Wn.2d at 640-41 (Talmadge, J., concurring). Multiple conspiracies may be charged where the facts of the case support multiple criminal agreements. In *State v. Walker*, 24 Wn. App. 78, 81, 599 P.2d 533 (1979), the Court of Appeals looked to whether the time, persons, places, offenses, and overt acts were distinct in deciding if multiple conspiracies were present. Similarly, the United States Court of Appeals for the Second Circuit looks to see if the following factors overlap in determining whether multiple conspiracies are only a single conspiracy for double jeopardy purposes: the offenses charged; overlap of participants, overlap of time; similarity of operation; existence of common overt acts; the geographic scope of the actions or location of the overt acts; common objectives; degree of the interdependence between the actions. *United States v. Macchia*, 35 F.3d 662, 667 (2d Cir. 1994); *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985).

In this case, Bobic and Stepchuk participated in a criminal enterprise, which included stealing, stripping, repurchasing, and reselling stolen vehicles with an obvious intent to further the goals of their criminal conspiracy. A single agreement to commit a series of crimes by the same conspirators was present here as each crime was only one step in the advancement of the scheme as a whole. *See United States v. Haddy*, 134 F.3d 542, 549, *cert. denied*, 525 U.S. 827, 119 S. Ct. 75, 142 L. Ed. 2d 59 (1998) (buying and selling of securities was merely one segment of a four-part scheme). Thus, in light of the statutory direction and the

facts of this case, we hold Bobic and Stepchuk committed only one violation of the conspiracy statute.

## CONCLUSION

In this case, notwithstanding the troubling image of a police officer peering through a peephole in a storage unit, the trial court did not err in denying Bobic's motion to suppress because there was no "search"; the contents of the unit were in open view as that doctrine is understood in our law where the officer was legally at the vantage point, the vantage point was not artificially improved, and the officer perceived what he did with his unaided vision. As to the conspiracy charges, Bobic and Stepchuk participated in a single criminal enterprise with multiple criminal objectives. Because their conduct constitutes only one violation of the conspiracy statute for purposes of double jeopardy, we vacate two of their three conspiracy convictions and remand the case to the trial court for proceedings consistent with this opinion.[7]

GUY, C.J., and SMITH, JOHNSON, MADSEN, ALEXANDER, SANDERS, IRELAND, and BRIDGE, JJ., concur.

---

[7]Bobic and Stepchuk have apparently served their sentences. State's Br. at 16-17. The relief of vacating two of three conspiracy convictions is that requested by counsel for at least one of the defendants at oral argument and in their briefs. *See, e.g.*, Stepchuk's Supplemental Br. at 19-20.