IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30235-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JESUS VIDALES MORALES, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — The meaning of the harassment statute, RCW 9A.46.020, is central to Jesus Morales's appeal of his conviction of two counts of felony harassment. He was convicted on one count for a harassment offense against the mother of his children, from whom he was estranged. His conviction on the other count might have been for a second harassment offense against her or might have been for a harassment offense against the third party to whom it was communicated. We agree with Mr. Morales that the criminal information did not put him on notice of one means advanced at trial by the State. We also agree that prosecuting him for a second count, with the mother of his children as the asserted victim, would violate double jeopardy. We reverse his conviction on the problematic count and remand for resentencing.

FACTS AND PROCEDURAL BACKGROUND

Jesus Morales and Yanett Farias have three children in common but had not lived together for a year and a half as of February 2011. On February 14, Mr. Morales stopped at the home of Ms. Farias's sister and the sister's husband, Trinidad Diaz, where he spoke to Mr. Diaz, venting his anger at Ms. Farias. Mr. Morales believed that Ms. Farias had taken $4,000 belonging to him. He had stopped at her home earlier that day to speak with her and, although she was home, she refused to open the door.

According to Mr. Diaz, Mr. Morales was so angry in speaking about Ms. Farias that he was trembling. He told Mr. Diaz that when Ms. Farias dropped her children off at day care the next morning, he would be waiting for her and kill her. Mr. Morales's conversation with Mr. Diaz lasted about three minutes. When it was over, Mr. Diaz, who feared that Mr. Morales would follow through with his threats, told his wife to call her sister and relate what Mr. Morales had said. Ms. Farias's sister called Ms. Farias, Ms. Farias contacted the police, and later that night police spoke with Ms. Farias and Mr. Diaz about the threats.

The next morning, Ms. Farias took her children to day care at the home of the baby-sitter, Araceli Castel, as usual, although with a plan for avoiding Mr. Morales if he was there when she arrived. She told the children to watch for their father and tell her if they saw him. The children knew why she was concerned, because her 11-year-old

2

daughter had acted as interpreter when Ms. Farias was contacted by police the night before.

As soon as Ms. Farias pulled up to Ms. Castel's home, the children pointed out Mr. Morales's truck across the street. He pulled out and drove his truck toward hers. Ms. Farias told the children to run inside; they quickly got out of the truck and ran into Ms. Castel's home. The children told Ms. Castel that their father was threatening their mother. Ms. Castel helped the 11-year-old call the police and then watched the altercation between Mr. Morales and Ms. Farias from her front door.

By then, Mr. Morales and Ms. Farias were still in their respective trucks, with Mr. Morales's truck alongside Ms. Farias's, preventing her from leaving. As Ms. Farias tried unsuccessfully to pull out from behind or in front of Mr. Morales's truck, he moved to block her and Ms. Castel heard him yell, "'This is as far as you've gone, you fucking bitch, because I'm going to kill you here.'" Report of Proceedings (Aug. 11, 2011) (RP) at 267. Mr. Morales, whose driver's side window was partly down, was leaning toward Ms. Farias's truck and pointing toward her—perhaps with something in his hand, although no witness claimed to have seen a weapon. Ms. Farias was cowering. Ms. Castel then began yelling at Mr. Morales and he left. After that Ms. Farias came into the house, shaken and crying, and told Ms. Castel, "'I thought they would be killing me today'" and "'[i]f it wouldn't have been for you, he could've killed me.'" RP at 274.

3

The State charged Mr. Morales with two counts of felony harassment under RCW

9A.46.020. The amended information stated, as to the first count:

> On or about February 14, 2011, in the State of Washington, without lawful authority, you knowingly threatened to cause bodily injury immediately or in the future to Yanett Farias and the threat to cause bodily injury consisted of a threat to kill Yanett Farias or another person, and did by words or conduct place the person threatened in reasonable fear that the threat would be carried out.

Clerk's Papers (CP) at 2. Count two contained identical language, but substituted the

date of February 15.

At trial, the elements instruction that the State originally proposed to address count

one (the February 14 threat) originally read, in part, as follows:

> To convict the defendant of the crime of Harassment of Another in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about February 14, 2011, the defendant knowingly threatened to kill Yanett Farias immediately or in the future;
> (2) That the words or conduct of the defendant placed Yanett Farias in reasonable fear that the threat to kill would be carried out.

CP at 20.

Before the instruction was read and provided to the jury the second numbered

element in the instruction was revised to read, "(2) That the words or conduct of the

defendant placed *Trinidad Diaz &/or* Yanett Farias in reasonable fear that the threat to

kill would be carried out" (the revision being indicated by italics). CP at 39 (Instruction

4

7). The modification was discussed by counsel and was clearly intentional. Mr. Morales did not object to the instruction.

The jury found Mr. Morales guilty on both counts.

At sentencing, defense counsel argued the two threats constituted a single course of conduct and that the unit of prosecution should be the number of victims rather than the number of threatening statements. The court rejected the argument, treated the two counts as separate convictions for purposes of Mr. Morales's offender score, and imposed a standard-range 10-month sentence for each count, to run concurrently. Mr. Morales appeals.

## ANALYSIS

Two of Mr. Morales's arguments on appeal are based on an asserted inconsistency between count one as it was charged and as tried. The parties' disagreement about the asserted inconsistency largely arises from the several actors contemplated by subsection (a)(i) of RCW 9A.46.020(1)—one of the four alternative means of committing harassment—and which role Mr. Diaz played in the State's theory of count one. In addition to the perpetrator, subsection (a)(i) contemplates (A) a person to whom a threat is communicated, (B) an intended victim of bodily harm, and (C) a target of the perpetrator's harassment (the individual the perpetrator hopes to coerce, intimidate, or humiliate). For clarity, we will sometimes refer to the person to whom the threat is

5

communicated as A, the intended victim of bodily harm as B, and the target of the harassment as C. The A, B, and C roles can be filled by one, two, or three persons.

The relevant provisions of the harassment statute state:

(1) A person is guilty of harassment if:
(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person [and]

. . . .

(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.

RCW 9A.46.020. "Threat" is defined elsewhere as including "to communicate, directly or indirectly the intent . . . [t]o cause bodily injury in the future to the person threatened *or to any other person*." Former RCW 9A.04.110(27)(a) (2007) (emphasis added).

Two cases are key in sorting out the parties' conflicting views of Mr. Diaz's role in the State's theory of count one. In *State v. G.S.*, 104 Wn. App. 643, 17 P.3d 1221 (2001), Division One of this court examined whether the definition of harassment in RCW 9A.46.020(1)(a) created alternative means of committing the crime or only a single means. In that case, a juvenile made statements to Tina Myrick, a school bus driver, threatening students at his school. She became concerned, reported the threats to school administrators, and G.S. was charged in juvenile court with felony harassment. The information alleged that he "'knowingly and without lawful authority, did threaten to cause bodily injury immediately or in the future to Tina Myrick, by threatening to kill students of Westside Place Alternative School, and the words or conduct did place said

6

person in reasonable fear that the threat would be carried out.'" *Id.* at 647-48. G.S. was found guilty.

On appeal, he argued that the definition of the first element of the crime in RCW 9A.46.020(1)(a)(i) created two alternative means. One was to communicate to A a threat to cause bodily injury to A, and the other was to communicate to A a threat to cause bodily injury to B. He maintained that the information charged him with a "communicate to A/bodily injury to A" alternative (relying on "did threaten to cause bodily injury immediately or in the future to Tina Myrick") but the State's only evidence was evidence of a "communicate to A/bodily injury to B" alternative (B being his fellow students)—an uncharged offense. Division One concluded that the definition created only a single means of committing the crime: communicating to A a threat to cause bodily injury to A or B.

A second issue raised by *G.S.* was whether, when the threat is to cause bodily injury not to the person to whom the threat is communicated, but to another person, the second element (provided at RCW 9A.46.020(1)(b)) required proof by the State that the person to whom the threat was communicated (A) was placed in reasonable fear that the threat will be carried out, or proof that the intended victim of bodily injury (B) was placed in such fear. The court concluded that under a plain reading of the statute, the "person threatened" who must be placed in reasonable fear is the person to whom the threat was communicated. *Id.* at 652. It based its decision primarily on its construction

7

of "the person threatened" in both RCW 9A.46.020(1)(a)(i) and in the definition of threat

at former RCW 9A.04.110(27)(a) as meaning A, the person to whom the threat is

communicated.

Later the same year, the statute was examined by our Supreme Court in *State v.*

*J.M.*, 144 Wn.2d 472, 482, 28 P.3d 720 (2001), in which the principal issue presented

for decision was the proper construction of the requirement that the threat be made

"knowingly." The parties disputed whether the crime is committed if a perpetrator

communicates to A a threat to harm B, with no knowledge that A will tell B about the

threat. The court concluded that the perpetrator commits the crime of felony harassment

by communicating to A the threat to harm B, even without knowing that A will then

communicate the threat to B. But it held that

> the statute as a whole requires that the perpetrator knowingly threaten to
> inflict bodily injury by communicating directly or indirectly the intent to
> inflict bodily injury; the person threatened must find out about the threat
> although the perpetrator need not know nor should know that the threat will
> be communicated to the victim; and words or conduct of the perpetrator
> must place the person threatened in reasonable fear that the threat will be
> carried out.

*Id.* at 482.

The then-recent decision in *G.S.* had been brought to the court's attention, and it

addressed it briefly in the conclusion of *J.M.*, stating:

> The issues in *G.S.* and those in this case are not the same, and thus the
> propriety of the holdings in that case is not before us. Nonetheless, lest
> confusion ensue, we do note that the court in *G.S.* appears to have equated

the *person threatened* with the person to whom the communication of the threat is made. That conclusion is, of course, at odds with our decision here. Under RCW 9A.46.020(1)(a)(i), the *person threatened* is generally the *victim of the threat, i.e., the person against whom the threat to inflict bodily injury is made.* The person to whom the threat is communicated may or may not be the victim of the threat. . . . The statute also contemplates that *a person may be threatened by harm to another.* An example that comes readily to mind is a communication of intent to harm the child of the *person threatened.* Again, however, the person to whom the perpetrator communicates the threat may be someone other than the *person threatened.*

*Id.* at 488 (emphasis added).

In other words, the Supreme Court did not construe "the person threatened" as used in the statute to mean the person to whom the threat was communicated, as the Court of Appeals had in *G.S.* Rather, it construed "the person threatened" to be the person whom the harassment statute is intended to protect. It noted that the act was aimed at making unlawful acts and threats "'which show a pattern of harassment *designed to coerce, intimidate,* or humiliate the victim,'" and construed "the person threatened" to mean the target of coercion, intimidation or humiliation. *Id.* at 485 (quoting RCW 9A.46.010). As the court's hypothetical points out, the target of coercion or intimidation when a parent is threatened with bodily injury to a child can clearly be the parent. If so, the second element of the State's case would require proof that the parent, not the child, was reasonably placed in fear.

Thus construed, and if we identify the target of coercion or intimidation as C, the first element of the State's proof when charging harassment under RCW 9A.46.020(1)(a)

9

is that the perpetrator threatens to cause bodily injury to the target of harassment (C) or to any other person (B). The second element requires that the State prove that the perpetrator by words or conduct places the target of harassment (C) in reasonable fear that the threat will be carried out. The person to whom the threat is communicated does not enter into the elements at all, nor need they; the definition of "threat" at former RCW 9A.04.110(27)(a) includes direct or indirect communications of intent.

Mr. Morales makes three arguments on appeal, two of which turn on a proper construction of the elements as they relate to the person to whom a threat is communicated and the person reasonably placed in fear. He argues first, that the information was insufficient to inform Mr. Morales that he was charged with harassing Mr. Diaz; second, that the trial court unconstitutionally charged Mr. Morales with an uncharged crime; and third, that because the proper unit of prosecution is placing the victim of harassment in fear, conviction of Mr. Morales for his actions on both February 14 and 15 constitutes double jeopardy.

I

Mr. Morales's first two arguments are two sides of the same coin. He argues, first, that the amended information did not identify Mr. Diaz as a victim of count one but that he was later presented as one; the amended information therefore failed to include a necessary element of the crime. Second, he argues that where the State presented Mr. Diaz as a potential victim to the jury through evidence and instruction, the jury was

permitted to convict him of an uncharged crime. The second statement of the error is the more apt.

The State charged Mr. Morales in count one with violating RCW 9A.46.020(1)(a), (b), which define harassment as requiring that the victim of the harassment—the "person threatened"—be placed in reasonable fear that the threat will be carried out. Ms. Farias was identified in the information as the victim. Yet at trial, the elements instruction informed the jury that it could convict Mr. Morales on count one if it found that Mr. Diaz was reasonably placed in fear that Mr. Morales's February 14 threat against Ms. Farias would be carried out.

A defendant has a constitutional right to be informed of the nature and cause of the charges against him. WASH. CONST. art. I, § 22; U.S. CONST. amend. VI. Because of the centrality of this notice to the ability to defend, it is error to instruct the jury on uncharged offenses or uncharged alternative theories. *State v. Kirwin*, 166 Wn. App. 659, 676, 271 P.3d 310 (2012) (Korsmo, A.C.J., dissenting) (citing, *e.g.*, *State v. Severns*, 13 Wn.2d 542, 548, 125 P.2d 659 (1942); *State v. Chino*, 117 Wn. App. 531, 540, 72 P.3d 256 (2003)). The error can be harmless if other instructions define the crime in a manner that leaves only the charged alternative before the jury. *Id.*

The State argues that it did not intend to portray Mr. Diaz as a victim but only as a person to whom the threat was communicated. But the jury clearly could have concluded otherwise. To begin with, the record demonstrates why the State might want to present

11

Mr. Diaz as an alternative victim. Mr. Morales's defense at trial was that he and Ms. Farias had been combative for months over custody and other issues; most recently, over his $4,000 that had gone missing. Their 11-year-old daughter, who testified at the trial, agreed on cross-examination that she knew her mother was asking the court in custody proceedings to prohibit her father from seeing her, that she thought it would make her father mad, that her parents always seemed to find things to fight about, that her father frequently got upset with her mother, and that his voice outside Ms. Castel's house on February 15 was not that different from other times her parents had argued.

Mr. Morales argued to the jury that the State had not met its burden of proving a true threat, or that Ms. Farias was reasonably placed in fear. He pointed to the fact that Ms. Farias drove her children to day care as usual on February 15 despite knowing of the prior day's threat and without police protection—evidence that might have been particularly persuasive as to count one. By offering Mr. Diaz as a second victim, the State provided an alternative basis for conviction if the jury was persuaded by Mr. Morales that after their long-term relationship Ms. Farias knew Mr. Morales better than to take his threat seriously.

The State's examination, instruction, and argument support Mr. Morales's claim that it pursued a theory of Mr. Diaz as an alternative victim. During the State's direct examination of Mr. Diaz, he testified that the sheriff's office "came to my house and asked me what had happened. They also asked me if I thought he would follow through,

12

and I told them yes." RP at 250. The State's redirect examination elicited Mr. Diaz's testimony that the reason he told his wife to call Ms. Farias was "[b]ecause the way I saw him I thought he would, would do that, what he had told me." RP at 258.

The State proposed (or, in any event, did not object to) the trial court's instruction 7, which stated the second element of count one as being "[t]hat the words or conduct of the defendant placed Trinidad Diaz &/or Yanett Farias in reasonable fear that the threat to kill would be carried out." In closing argument, the State referred to the instruction and to its reference to Trinidad Diaz. It reminded the jury, twice, of Mr. Diaz's testimony that he was fearful and concerned that Mr. Morales's threat would be carried out. Mr. Diaz's being placed in reasonable fear would satisfy the State's burden of proving the elements of harassment only if he was the "person threatened."

The State argues that statements made during the sentencing hearing by Mr. Morales's lawyer suggest that the lawyer, at least, was always clear about the State's intended theory and proof. We do not attach the same significance to the lawyer's statements as does the State, but what the lawyer believed about the prosecutor's intended theory is irrelevant. What matters is what the jury knew about the State's theory. In light of what was presented to the jury, it could have convicted Mr. Morales of an uncharged alternative.

Mr. Morales was, then, tried for count one on an uncharged alternative theory. Because the elements instruction supported the new theory, the error was not harmless.

13

*Kirwin*, 166 Wn. App. at 677. Mr. Morales would be entitled to a new trial on count one.
Also germane to any new trial, though, is his double jeopardy challenge, which we
address next.

II

Mr. Morales argues that the February 14 and 15 communications of the same
threat, in each case placing Ms. Farias in fear, is a course of conduct that is the proper
unit of prosecution for harassment. As a result, he argues, charging him with two counts
violates the double jeopardy provisions of the United States and Washington
Constitutions. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. No Washington
decision addresses the unit of prosecution for harassment.

A defendant may face multiple charges arising from the same conduct but the
principle of double jeopardy precludes multiple punishments for the same offense. *State
v. Hall*, 168 Wn.2d 726, 729-30, 230 P.3d 1048 (2010) (citing *State v. Freeman*, 153
Wn.2d 765, 770-71, 108 P.3d 753 (2005); *State v. Vladovic*, 99 Wn.2d 413, 422, 662
P.2d 853 (1983)). The determination of whether or not a defendant faces multiple
convictions for the same crime depends on the unit of prosecution. *Id.* at 730 (citing
*State v. Westling*, 145 Wn.2d 607, 610, 40 P.3d 669 (2002)). "The unit of prosecution for
a crime may be an act or a course of conduct." *State v. Tvedt*, 153 Wn.2d 705, 710, 107
P.3d 728 (2005) (citing *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218,
225-26, 73 S. Ct. 227, 97 L. Ed. 260 (1952)). "The proper question is to determine what

14

act or course of conduct the legislature has defined as the punishable act." *State v.*

*Varnell*, 162 Wn.2d 165, 168, 170 P.3d 24 (2007).[1]

The approach to analyzing the unit of prosecution is well settled:

> [T]he first step is to analyze the statute in question. Next, we review the statute's history. Finally, we perform a factual analysis as to the unit of prosecution because even where the legislature has expressed its view on the unit of prosecution, the facts in a particular case may reveal more than one "unit of prosecution" is present.

*Varnell*, 162 Wn.2d at 168 (citing *State v. Bobic*, 140 Wn.2d 250, 263-66, 996 P.2d 610

(2000)). If the statute is ambiguous as to the unit of prosecution, the rule of lenity applies

and the ambiguity is "'resolved against turning a single transaction into multiple

offenses.'" *Tvedt*, 153 Wn.2d at 711 (internal quotation marks omitted) (quoting *State v.*

*Adel*, 136 Wn.2d 629, 635, 965 P.2d 1072 (1998)).

Looking first at the harassment statute, RCW 9A.46.010 codifies the legislative

finding in enacting the statute, including that "[the] chapter is aimed at making unlawful

the repeated invasions of a person's privacy by acts and threats which show a pattern of

harassment designed to coerce, intimidate, or humiliate the victim." In *State v. Alvarez*,

74 Wn. App. 250, 257, 872 P.2d 1123 (1994), Division One of our court rejected that

statement of intent as a basis for concluding that the statute *requires* more than one

---

[1] The fact that a series of arguably distinct criminal acts, evaluated in a commonsense manner, may be prosecuted as a "continuing course of conduct"—discussed at length by the dissent—is unrelated, in our view, to the threshold issue of the proper unit of prosecution.

communication of a threat. The Washington Supreme Court affirmed, stating that

"[a]lthough the legislative finding in RCW 9A.46.010 indicates the Legislature intended

to make criminal 'repeated invasions of a person's privacy' by acts and threats showing a

'pattern of harassment,' *this does not lead to a conclusion that a single act of harassment*

*may not be charged* under the act. . . . Nothing in [the section defining harassment]

indicates a legislative intent to criminalize *only invasion of privacy by repeated acts and*

*threats* showing a pattern of harassment." *State v. Alvarez*, 128 Wn.2d 1, 12, 904 P.2d

754 (1995) (emphasis added). Neither Division One nor the Supreme Court explicitly

addressed the different question presented here: whether, if a person threatens a single

harm, placing the person threatened in fear, the unit of prosecution is then that threat of

harm, or is instead each time and place he or she repeats it to the victim or third parties.

As recognized in *Alvarez*, the venue provision of the harassment statute sheds

some light on the unit of prosecution by discussing possible components of a harassment

offense. It provides:

> Any harassment offense committed as set forth in RCW 9A.46.020 . . . may
> be deemed to have been committed where the conduct occurred or at the
> place from which the threat or threats were made or at the place where the
> threats were received.

RCW 9A.46.030, *quoted in* 74 Wn. App. at 259. *Alvarez* focused on the fact that the

venue provision treats a "harassment offense" as including a single threat. For present

16

purposes, the provision is illuminating in treating a "harassment offense" as also including multiple threats.

The State argues that the most important indication of the proper unit of prosecution in the harassment statute is the stalking provision at RCW 9A.46.110, which criminalizes "repeatedly harass[ing] or repeatedly follow[ing] another person," defining "repeatedly" to mean "on two or more separate occasions." RCW 9A.46.110(1)(a), 6(e). The State argues that the same language is "glaringly absent" from RCW 9A.46.020. Br. of Resp't at 17.

In *Hall*, the Supreme Court was not persuaded by an argument that if the legislature intended a single unit of prosecution based on a course of conduct, it could have said so plainly. 168 Wn.2d at 733. What matters is not what it did not say, but what it did say. The language it used to define the operative criminal conduct in RCW 9A.46.020—to "knowingly threaten"—is not inherently a single act.

Where the language of a statute does not directly suggest the unit of prosecution, our Supreme Court has examined the language for the focus of the statute, seeking to determine the statutory aim and whether some variables by which the unit of prosecution might be measured are secondary. Thus, in *Varnell*, in which the Supreme Court determined the unit of prosecution for criminal solicitation, it found the statute to focus on a perpetrator's "'intent to promote or facilitate'" a crime rather than the crime to be committed; it also found the number of victims to be secondary. 162 Wn.2d at 169. In

17

*Tvedt*, in which the court determined the unit of prosecution for robbery, it found indications that the legislature intended the unit of prosecution to include a forcible taking of property from a person having an ownership, representative, or possessory interest in the property, against the person's will. It found that other variables of a robbery—the number of items taken and the number of persons present—did not bear on the unit of prosecution.

We need not determine the unit of prosecution for all harassment scenarios to conclude that where, as here, (1) a perpetrator threatens to cause bodily harm to a single identified person at a particular time and place and (2) places a single victim of the harassment in reasonable fear that the threat will be carried out, the conduct constitutes a single offense. The harassment statute focuses on a perpetrator's coercing, intimidating, or harassing the victim by a threat or threats that place her in reasonable fear. The number of persons who might learn of the threat and communicate with the victim about it and the number of times it might be communicated are secondary.

As discussed in *Tvedt*, a unit of prosecution that results in additional charges based on variables that are secondary can result in convictions that are disproportionate to an offender's conduct. *See* 153 Wn.2d at 716 n.4. Suppose Mr. Morales had stopped at the homes of other relatives or friends on February 14 and repeated the same conversation he had with Mr. Diaz. Assume that the State did not contend that these third parties were additional victims of harassment but relied upon the conversations as additional acts of

18

harassment toward Ms. Farias—as it now says was its intention with the conversation with Mr. Diaz. There would be no meaningful difference in Mr. Morales's conduct but considerable disparity in the sentence he would face.[2]

Once the unit of prosecution is determined, a factual analysis is necessary to decide if more than one unit of prosecution is present. *Id.* at 717. Double jeopardy is avoided only where the facts of the case support multiple units of prosecution. *Id.* The facts of this case present only one unit of prosecution for charging Mr. Morales with harassing Ms. Farias. The parties have not briefed, and we do not reach, whether the facts would support two units of prosecution if one of the State's counts had identified Mr. Diaz as the victim.

---

[2] Or, to adopt the dissent's illustration of a threat on March 1 to kill a victim on March 31 at high noon, is the unit of prosecution the threat, or every one of dozens of times that the perpetrator repeats his threat to his companions in the saloon? Particularly where the threat is addressed to the person threatened, we will agree with the dissent that with repetition of the threat, there is a prospect of incrementally increased harm. But the question is whether that difference is the key to the legislature's intended unit of prosecution. The unit of prosecution for robbery, for instance, is not the number of persons placed in fear. *Tvedt*, 153 Wn.2d at 714. The unit of prosecution for second degree arson damaging automobiles is not the number of automobiles damaged. *Westling*, 145 Wn.2d at 611. Again, while the Supreme Court in *Alvarez* agreed that a single act of harassment may be charged under RCW 9A.46.020, it also recognized that "the Legislature intended to make criminal 'repeated invasions of a person's privacy' by acts and threats showing a 'pattern of harassment.'" 128 Wn.2d at 12.

19

No. 30235-1-III
*State v. Morales*

We reverse Mr. Morales's conviction of count one and remand for resentencing.

_____
Siddoway, J.

I CONCUR:

_____
Sweeney, J.

20

No. 30235-1-III

KORSMO, C.J. (dissenting) — Communicating a threat to the intended victim the day after making the same threat to another person is not a continuing course of conduct. I dissent from that portion of the court's opinion.[1] The unit of prosecution here is the number of threats rather than the victim of those threats. Precedent, the statutory language, and prior case law establish that there was no continuing course of conduct here. The majority's result flies in the face of legislative intent.

This court has already decided that a single threat constitutes the unit of prosecution for harassment. *State v. Alvarez*, 74 Wn. App. 250, 257, 872 P.2d 1123 (1994), *aff'd*, 128 Wn.2d 1, 904 P.2d 754 (1995). Since *Alvarez* has already decided the issue, there is no reason to reconsider that ruling, let alone to vary from it. *State v. Bobic*, 140 Wn.2d 250, 996 P.2d 610 (2000), does not support the majority's position. *Bobic* holds that even where the legislature has defined a crime as a single offense, there still can be *multiple* crimes if the facts support them. *Id.* at 266. It does not support the converse proposition that a crime that can be committed by a single act necessarily prohibits prosecution for multiple violations of the same offense.

---

[1] The instructional error identified by the majority requires a new trial on that count. *State v. Severns*, 13 Wn.2d 542, 548, 125 P.2d 659 (1942); *State v. Chino*, 117 Wn. App. 531, 540, 72 P.3d 256 (2003).

Even when the offense is defined in the singular, multiple counts of the crime are still subject to a continuing conduct analysis. *Id.* at 266-67. In applying unit of prosecution analysis, courts look to discern "'the evil the legislature has criminalized.'" *State v. Hall*, 168 Wn.2d 726, 731, 230 P.3d 1048 (2010) (quoting *State v. Varnell*, 162 Wn.2d 165, 169, 170 P.3d 24 (2007)). The continuing conduct analysis is a factual inquiry applying the unit of prosecution to the charged behavior. *E.g.*, *Bobic*, 140 Wn.2d at 266.

The language of the statute does not support the continuing conduct conclusion. Paraphrased, the harassment statute defines a crime where a person "knowingly threatens" harm to another with the result that the person threatened (the victim) reasonably fears that the threat will be carried out. RCW 9A.46.020. The only mental state is to "knowingly" threaten; there is no requirement that the defendant intend that the threat be conveyed to the victim. *State v. J.M.*, 101 Wn. App. 716, 730, 6 P.3d 607 (2000), *aff'd*, 144 Wn.2d 472, 28 P.3d 720 (2001). This latter point is one reason the majority's approach does not work under the facts of this case. Objectively viewed, a threat about a victim made to a third party does not share the same purpose as a threat made directly to the victim. The objective purpose of a threat to the third person is unclear; the objective purpose of the threat to the victim is to place her in fear. The two threats cannot have the same purpose because the person to whom they were directed was

2

different. The first threat also did not further the second threat or appear related to it other than both threats ultimately placed the victim in reasonable fear of death.

Case law does not support the majority's approach. The object of a conspiracy is not the unit of prosecution for conspiracy. *Bobic*, 140 Wn.2d at 265-66. Instead, the unit of prosecution is the agreement to engage in criminal conduct without regard to how many criminal objectives the agreement contains. *Id.* Similarly, the object of a harasser's threats should not be the unit of prosecution for harassment. As previously noted, the unit of prosecution is to knowingly threaten harm to another person; one threat is sufficient. *Alvarez*, 74 Wn. App. at 257. That unit of prosecution does not suggest any continuing course of conduct. Each discrete threat is its own crime without regard to any similarity in the wording of the threats. Presumably, if Jesus Morales had run into the victim in the grocery store before they met at the day-care facility, the majority would conclude that a threat to kill her at the store would not be the same course of conduct as the threat he had conveyed the day before to kill her at the day care. But the unit of prosecution should not depend upon the specific language of the threat conveyed. Nothing in RCW 9A.46.020 suggests that the legislature intended the specific threat language to be an important factor in defining the offense.

There is a difference between one threat communicated to 20 people on one occasion and same threat individually communicated to those same 20 people on 20

3

occasions. The no-contact order violation cases provide the best analogy. There our courts have repeatedly concluded that each violation of the no-contact order provision is properly punished separately rather than constituting a continuing course of conduct. *E.g.*, *State v. Brown*, 159 Wn. App. 1, 248 P.3d 518 (2010) (five violations based on contacts on five different days); *State v. Allen*, 150 Wn. App. 300, 207 P.3d 483 (2009) (two violations based on two separate e-mails opened on same day); *State v. Parmelee*, 108 Wn. App. 702, 32 P.3d 1029 (2001) (three letters to victim constituted three violations). Where the continuing course of conduct analysis results in a single prosecution, it frequently has been because the crime was legislatively defined as one offense having either multiple objectives or multiple methods of achieving a single objective. *E.g.*, *Hall*, 168 Wn.2d 726 (witness tampering); *Varnell*, 162 Wn.2d 165 (unit of prosecution for solicitation was each person solicited to commit crime rather than the objective of the solicitation); *Bobic*, 140 Wn.2d 250 (conspiracy). Those cases are not this one.

This court should hold that a threat conveyed to two different people at two different locations on two different days is not a continuing course of conduct merely because the same victim is reasonably placed in fear by the threats. The unit of prosecution is each threat. There is no evidence that these threats were part of the same

4

scheme to harass the victim. Rather, they merely reflected that Mr. Morales claimed he intended to perform the same act of violence against the victim.

Finally, the majority's approach flies in the face of the legislative intent to prevent multiple acts of harassment. RCW 9A.46.010. Knowing that one threat was the same as one thousand threats, an offender has no reason to stop a campaign of harassment. A threat on March 1 to kill the victim on March 31 at high noon constitutes a violation of the statute. Repeating the same threat daily for the rest of the month would constitute a continuing course of conduct according to the majority's construction of the statute. We should not adopt that interpretation since that result is the exact opposite of what the legislature expressly says it intended.

The unit of prosecution here is the knowing threat, not the victim of the threat.[2] The trial court properly rejected Mr. Morales's argument. I would reverse count one due to the instructional error and remand it for a new trial.

_Korsmo, C.J._
Korsmo, C.J.

---

[2] Under the majority's analysis, a single threat directed at a group of people ("I will kill everyone in this room") apparently could result in a multitude of convictions depending upon how many victims took the threat to heart.

5