IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80409-0-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED IN PART |
| CANTER, STEPHEN WAYNE, | ) | OPINION |
| DOB: 01/10/1971, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Stephen Wayne Canter appeals his convictions for two counts of attempted first degree child molestation, arguing that double jeopardy bars the convictions. He also appeals his sentence, alleging that his crimes amount to the same criminal conduct in calculating his offender score. Because Canter intended to molest two separate children and took substantial steps toward accomplishing those criminal objectives, we reject his arguments. In the unpublished part of this opinion, we decline to address Canter's argument raised for the first time on appeal that police unlawfully impounded his vehicle. We also reject Canter's claims that police exceeded the scope of a search warrant, destroyed potentially useful evidence in bad faith, and violated his right to privacy under the Washington privacy act (WPA), chapter 9.73 RCW. Finally, we conclude sufficient evidence supports the trial court's determination that Canter took substantial steps to commit each count of attempted child molestation and that the arguments Canter raises in his statement of additional grounds for review lack merit. We affirm his convictions and sentence.

Citations and pin cites in the unpublished part of this opinion are based on the Westlaw online version of the cited material.

FACTS

The Washington State Patrol (WSP) Missing and Exploited Children Task Force partners with other law enforcement agencies to conduct undercover sex-crime operations. WSP Detective Carlos Rodriguez is the sergeant of the task force and began one such undercover operation by placing an advertisement in the "Casual Encounters" section of Craigslist.[1] He posed as a mother with two young daughters seeking a "daddy." Identifying himself as "Ben," Canter responded to the ad and began e-mailing with Detective Rodriguez online.[2]

The two eventually began texting. Detective Rodriguez told Canter that the daughters were ages 11 and 8. Canter described specific sex acts he desired with the girls. They also discussed "needs" for the "family," including a gift card with prepaid Tracfone[3] minutes; and "rules" for sex, including using condoms. They did not specifically discuss exchanging money for sex, but Canter promised, "As Daddy, I would of course buy things for them from time to time. They need things also and you should have some relief if money is tight right now."

Eventually, Canter spoke by telephone with a female undercover detective posing as the mother. During this conversation, Canter talked about bringing the girls candy so they "will like him." Canter learned that the 11-year-old "likes Skittles" and that the 8-year-old "likes Butterfingers." Detective Rodriguez

---

[1] Detective Rodriguez described the Casual Encounters section as "specifically for no-strings-attached sex."

[2] Craigslist generates an automated anonymous e-mail address that allows direct communication between the one who placed the advertisement and the responder.

[3] Tracfone provides prepaid cell phone services without requiring the user to enter into a service plan contract.

obtained warrant authorization to intercept and record the call, but the trial court later ruled the authorization was invalid.

Canter arranged to meet the girls in person. He discussed in graphic detail the sex acts he intended to engage in with the girls.[4] Detective Rodriguez told Canter to drive to an "am/pm" convenience store and wait there for a text message with the girls' home address. Canter responded that he would be driving a "black SUV."[5]

Canter drove a black Land Rover SUV to the am/pm at the agreed-on date and time. Surveillance officers watched Canter enter the am/pm and then drive across the street to a parking lot with an Albertsons grocery store and a McDonald's restaurant.[6] Canter simultaneously e-mailed Detective Rodriguez that he was "driving to the McDonald[']s." Detective Rodriguez texted Canter the address of a "target house" where detectives waited to arrest him.

Surveillance officers saw Canter drive back and forth in front of the target house as though he was lost.[7] At the same time, Detective Rodriguez received an e-mail from Canter that he had parked outside in "a white truck" and wanted the mother and girls to come out. When no one came out of the target house,

---

[4] For example, Canter described how at their first meeting, he would "set the stage" by giving the girls a hug and at the same time, "run my hands over their butts and give them kisses on the lips." He would then escalate the touching to showering with them and digitally penetrating them while they all watched cartoons together. Once the girls had "a sense of safety" with him, Canter said he would tell them "how good they are" when they have oral and vaginal sex with him.

[5] Sport utility vehicle.

[6] After Canter's arrest, officers confirmed that he visited the Albertsons and bought the girls' favorite candy, Tracfone minutes, and condoms.

[7] One officer said the Land Rover "had driven past [the target house] a few times, stopped, and then would drive past slowly as if, similar to as if someone was trying to find an address on a mailbox."

Canter drove away. Officer Andy Illyn and Deputy Jeff Ross followed Canter and activated the emergency lights on their unmarked patrol car. Deputy Ross conducted a "slow speed pinning" maneuver to prevent Canter from fleeing. Canter stopped his SUV in an empty parking lot.

Officers arrested Canter and seized his SUV. Canter had a white cell phone, his wallet, and cash on him at the time. Detective Rodriguez directed officers to bring Canter and the Land Rover to the target house to interview Canter and conduct an inventory search of the SUV before impounding it. Officer Illyn gave Canter a choice to allow Officer Illyn to drive the SUV back to the house or he would have it towed there. Canter agreed to let Officer Illyn drive the SUV to the target house. While inventorying the SUV, officers noticed a backpack of the type commonly used to transport laptops. They stopped the inventory, locked the vehicle, and applied for a search warrant. While waiting for the search warrant, officers impounded the SUV at the WSP "bullpen."

Detective John Garden applied for a warrant to search the cell phone found on Canter during his arrest and Canter's Land Rover, including any "digital media," "digital storage devices," "cell phones," and documents found inside the SUV. He included in his affidavit copies of Canter's text and e-mail conversations with the mother as well as a description of the phone call between Canter and the female officer posing as the mother. A judge approved the warrant, authorizing police to search Canter's SUV and seize any electronics found in the SUV, as well as search the contents of the white cell phone and any electronics found in the Land Rover. Officers executing the search of the SUV

4

found a laptop, two black cell phones, two thumb drives, and a plastic Albertsons bag with an unopened box of condoms, a Tracfone gift card for 60 minutes, and unopened bags of Skittles and Butterfingers inside.

Canter had secured several devices by passcodes and encryption software, so officers were unable to recover the text or e-mail conversations from them. But officers did recover fragments of data referencing the e-mail address Canter used to communicate with Detective Rodriguez from the laptop. They also found evidence that Canter had used the laptop to search the Internet for how to set up a "Google Voice" telephone number. Canter's laptop Internet searches listed the Google Voice number he gave to the female officer posing as the mother to call him. And a manual search of the white cell phone taken from Canter's person during his arrest showed the Google Voice number in the phone's "call logs." Finally, a "test" text message Detective Rodriguez sent from the phone number he had been using for the mother to communicate with Canter "was received by the phone [Canter] possessed" the night of his arrest.

The State charged Canter with one count of attempted first degree rape of a child and one count of commercial sex abuse of a minor. Pretrial, Canter moved to suppress evidence he claimed officers obtained following an unlawful arrest or under a search warrant unsupported by probable cause. Canter did not challenge the police impound or inventory search of his SUV. Instead, he claimed that the search exceeded the warrant's scope. Specifically, the plastic grocery bag with the Tracfone gift card, candy, and condoms that officers found in the SUV. The court scheduled a suppression hearing.

During the two-day suppression hearing, Officer Illyn testified about setting up surveillance at the am/pm store. He said that the task force "command center" at the target house "sent Deputy Ross a picture" of a person it believed was the person communicating with Detective Rodriguez. "[B]ut it turned out not to be the defendant." Officer Illyn admitted that he did not mention the photograph in his report or during his defense interview. But he believed he saw the photograph on Deputy Ross' cell phone. None of the task force members mentioned the picture in their testimony or reports.

The trial court denied Canter's motions, ruling probable cause supported Canter's arrest and the grocery bag of items fell "under the plain view exception" to the warrant. The court suppressed the content of the phone conversation between Canter and the female detective posing as the mother because of "all the problems" with the affidavit to intercept the call. The court entered extensive findings of fact and conclusions of law in support of its rulings. Canter then moved to compel discovery of the suspect photograph Officer Illyn testified to and any information associated with it.

On June 30, 2017, the prosecutor notified Detective Rodriguez of the motion to compel. In early August, while the defense motion was pending but before the trial court issued a subpoena duces tecum,[8] the WSP collected all of the task force's Blackberry devices and replaced them with Apple iPhones. The Blackberry devices were "wiped" and recycled by an outside company. All copies of the suspect photograph sent to Deputy Ross were destroyed in the

---

[8] Following a hearing, the court issued the subpoena on August 15, 2017.

process.

Canter moved to dismiss his charges, arguing the police destroyed material exculpatory evidence.  In the alternative, he asserted police destroyed potentially useful evidence in bad faith.  The trial court held a hearing.  It concluded the photograph and any associated information were not materially exculpatory because "this prosecution is not going to rise or fall on the identity of the individual [in] that photograph."  Instead, it will "rise and fall on the connection between the electronic communication and then the — the facts on the ground on the night in question."  The court also determined that the "nature of this evidence does not leave the defendant unable to speak about what was sent and what the value of that may or may not have been and potentially other leads."  The court then concluded that even if the photograph were potentially useful, "I can't find, based on what's in front of me here," that the police destroyed it in bad faith.  The court denied Canter's motion to dismiss.

The parties stipulated to a bench trial on agreed documentary evidence on the amended charges of two identical counts of attempted first degree child molestation.  At trial, the court determined that Canter took "substantial steps" to commit the crimes by driving to the am/pm, buying specified items, and driving back and forth in front of the target house.  The court also found that the "car going back and forth is consistent with" Canter's contemporaneous request for the mother and her daughters to come outside.

The court convicted Canter of both counts and entered findings of fact and conclusions law.  Because the crimes involved two victims, the court rejected

7

Canter's claim that they constituted the "same criminal conduct" for calculating his offender score at sentencing. The court imposed concurrent standard-range 60-month sentences on each count. Canter appeals.

ANALYSIS

Double Jeopardy

Canter claims double jeopardy bars his conviction for two counts of attempted child molestation because he "took only a single substantial step" toward committing the crimes. The State argues that Canter's convictions do not violate double jeopardy because he tried to commit crimes against two separate victims. We agree with the State.

Double jeopardy protects a defendant from being convicted more than once under the same statute if the defendant commits only one unit of the crime. State v. Westling, 145 Wn.2d 607, 610, 40 P.3d 669 (2002) (citing State v. Adel, 136 Wn.2d 629, 634, 965 P.2d 1072 (1998)). The United States Constitution and the Washington State Constitution protect against double jeopardy equally. In re Pers. Restraint Petition of Davis, 142 Wn.2d 165, 171, 12 P.3d 603 (2000); see U.S. CONST. amend. V; WASH. CONST. art. I, § 9.

Here, the State charged Canter with two identical counts in violation of RCW 9A.44.083 (child molestation in the first degree) and RCW 9A.28.020 (criminal attempt). When a defendant is convicted of multiple violations of the same statute, the double jeopardy question focuses on "what 'unit of prosecution' . . . the Legislature intended as the punishable act under the specific criminal statute." Adel, 136 Wn.2d at 633-34 (citing Bell v. United States, 349 U.S. 81,

8

83, 75 S. Ct. 620, 99 L. Ed. 905 (1955); State v. Mason, 31 Wn. App. 680, 685-87, 644 P.2d 710 (1982)).  Statutory interpretation and legislative intent governs how we determine the unit of prosecution.  In re Pers. Restraint Petition of France, 199 Wn. App. 822, 833, 401 P.3d 336 (2017); State v. Barbee, 187 Wn.2d 375, 382, 386 P.3d 729 (2017).  Statutory interpretation is a question of law that we review de novo.  State v. Womac, 160 Wn.2d 643, 649, 160 P.3d 40 (2007); State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010).

State v. Bobic, 140 Wn.2d 250, 996 P.2d 610 (2000), sets forth our three-step inquiry.  "[T]he first step is to analyze the statute in question."  Bobic, 140 Wn.2d at 263.  Next, we review the statute's history.  Bobic, 140 Wn.2d at 263.  Finally, we perform "a factual analysis as to the unit of prosecution" because "even where the Legislature has expressed its view on the unit of prosecution, the facts in a particular case may reveal [that] more than one 'unit of prosecution' is present."  Bobic, 140 Wn.2d at 266.  If the legislature fails to define the unit of prosecution or its intent is unclear, the "rule of lenity" applies and we "resolve any uncertainty against turning a single transaction into multiple offenses."  State v. Gaworski, 138 Wn. App. 141, 149, 156 P.3d 288 (2007).

For inchoate offenses such as the attempt to commit a crime, the unit of prosecution "is the act necessary to support the inchoate offense, not the underlying crime."  State v. Boswell, 185 Wn. App. 321, 329, 340 P.3d 971 (2014).  Citing Boswell, Canter argues that the unit of prosecution for his inchoate attempt crime is the single substantial step he took toward molesting two children.

9

In <u>Boswell</u>, the defendant tried to kill his girlfriend twice and a jury convicted him of two counts of attempted murder. <u>Boswell</u>, 185 Wn. App. at 324-25. Boswell argued double jeopardy barred the two convictions because he only intended to kill one person. <u>Boswell</u>, 185 Wn. App. at 326. Division Two of our court concluded the unit of prosecution for an attempt charge is the "substantial step" toward the commission of the underlying crime. <u>Boswell</u>, 185 Wn. App. at 329-330. Recognizing that defendants could take multiple steps toward committing a crime, the court applied a "course of conduct" analysis to determine the unit of prosecution and whether multiple steps toward a single crime were distinguishable enough in time and method to warrant charges as separate acts. <u>Boswell</u>, 185 Wn. App. at 332. Division Two concluded that because Boswell engaged in two separate and distinct courses of conduct (first, poisoning; then, shooting) in his attempts to kill his girlfriend, his convictions did not violate double jeopardy. <u>Boswell</u>, 185 Wn. App. at 332.

This case differs from <u>Boswell</u>. In <u>Boswell</u>, the defendant took multiple steps toward murdering a single victim; while here, Canter took steps to molest two separate young girls.

In <u>State v. Diaz-Flores</u>, 148 Wn. App. 911, 914, 201 P.3d 1073 (2009), a jury convicted the defendant of two counts of voyeurism for peeking into a bedroom window to observe two people having sex. Diaz-Flores argued the court should vacate one of his convictions because he committed only a single act of viewing, even though he observed two people. <u>Diaz-Flores</u>, 148 Wn. App. at 916. We disagreed. Because the statute prohibited viewing "another person,"

we concluded that the legislature intended to protect the privacy of all individuals and held that the unit of prosecution was "each person the voyeur views." Diaz-Flores, 148 Wn. App. at 917; RCW 9A.44.115(2).

Under RCW 9A.44.083(1), a person is guilty of first degree child molestation when he has "sexual contact with another" person who is less than 12 years old. Like the voyeurism statute in Diaz-Flores, the child molestation statute unambiguously protects each child from sexual contact. A person attempts to commit a crime when that person, "with intent to commit a specific crime, . . . does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). The facts here clearly establish two units of prosecution because Canter took steps to have sexual contact with two separate children.

As much as Canter suggests a single substantial step cannot support convictions for two separate attempt crimes,[9] he is mistaken. While not a double jeopardy case, State v. Price, 103 Wn. App. 845, 14 P.3d 841 (2000), is instructive here. In that case, Price shot his gun into a passing car with two people inside and a jury convicted him of two counts of attempted first degree murder. Price, 103 Wn. App. at 849-50. Price argued that "firing one shot into the vehicle could not constitute a substantial step toward the commission of first degree murder for both [victims]." Price, 103 Wn. App. at 851. Division Two concluded that "a reasonable jury could have found that the act of firing a single

_____

[9] Canter acknowledges he took several steps toward molesting the children but contends that the steps were so similar in time and purpose that they should be considered only one step under a course of conduct analysis.

bullet into a vehicle occupied by two people sufficiently corroborated that Price took a substantial step toward commission of first degree murder for both victims." Price, 103 Wn. App. at 852.

Here, Canter took substantial steps toward sexual contact with an 8-year-old girl by communicating with her fictitious mother and setting up a meeting. He bought a Tracfone gift card that the mother asked for, the girl's favorite candy, and the condoms the mother required if Canter wanted sexual contact with the girl. He then drove to the child's house. Canter took those same substantial steps toward having sexual contact with an 11-year-old girl.

Canter's citations to State v. Varnell, 162 Wn.2d 165, 170 P.3d 24 (2007) (one unit of prosecution for soliciting a person to commit multiple crimes), and Bobic (one unit of prosecution for conspiring to commit multiple crimes) do not compel a different result. Unlike the crime of solicitation in Varnell, 162 Wn.2d at 169, where the "number of victims is secondary to the statutory aim, which centers on the agreement on solicitation of a criminal act"; or the crime of conspiracy in Bobic, 140 Wn.2d at 265-66, where the focus is on "an agreement and an overt act rather than the specific criminal objects of the conspiracy," attempted child molestation aims to punish a substantial step toward molesting each child. We conclude that double jeopardy does not bar Canter's convictions for two counts of attempted first degree child molestation.

Same Criminal Conduct

Canter argues the trial court erred when it failed to treat his two convictions as the "same criminal conduct" during sentencing. The State claims

Canter's offenses cannot be the same criminal conduct because Canter intended to have sexual contact with two separate victims. We agree with the State.

While similar, "double jeopardy" and "same criminal conduct" analyses are distinct and separate inquiries. State v. French, 157 Wn.2d 593, 611, 141 P.3d 54 (2006). As discussed, under a double jeopardy analysis, we determine whether one act can constitute two convictions. Under a "same criminal conduct" analysis, we determine whether two convictions warrant separate punishments. State v. Chenoweth, 185 Wn.2d 218, 222, 370 P.3d 6 (2016).

Multiple current offenses that encompass the same criminal conduct are counted as a single offense when calculating a defendant's offender score. RCW 9.94A.589(1)(a). Two or more current crimes constitute the "same criminal conduct" when those crimes "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). The defendant bears the burden to establish that his convictions amount to the same criminal conduct, and if any element is missing, the sentencing court must count the offenses separately. State v. Aldana Graciano, 176 Wn.2d 531, 540, 295 P.3d 219 (2013); State v. Vike, 125 Wn.2d 407, 410, 885 P.2d 824 (1994). We construe RCW 9.94A.589(1)(a) narrowly to reject most assertions of same criminal conduct. Aldana Graciano, 176 Wn.2d at 540.

We review a trial court's ruling on whether multiple offenses constitute the same criminal conduct for an abuse of discretion or misapplication of the law. State v. Latham, 3 Wn. App. 2d 468, 479, 416 P.3d 725 (2018) (citing State v. Walden, 69 Wn. App. 183, 188, 847 P.2d 956 (1993). A court abuses its

13

discretion when the record supports only one conclusion on whether crimes constitute the same criminal conduct. Latham, 3 Wn. App. 2d at 479 (citing Aldana Graciano, 176 Wn.2d at 537-38). When the record adequately supports either conclusion, the matter lies in the court's discretion. Latham, 3 Wn. App. 2d at 479.

The parties do not dispute that Canter committed his crimes at the same time and place. But Canter claims that his crimes involved the "same victim" because a "fictitious" victim is "no victim" under RCW 9.94A.030(55) (defining "victim" as "any person who has sustained emotional, psychological, physical, or financial injury to person or property as a direct result of the crime charged"). According to Canter, his victimless crimes are "analogous to various drug crimes for which the victim is the public at large."

Our Supreme Court has recognized that some specific crimes victimize only the public at large. Specifically, it concluded unlawful possession of a firearm is analogous to possession of a controlled substance, which "victimizes the general public." State v. Haddock, 141 Wn.2d 103, 110-11, 3 P3d 733 (2000). But the court also contrasted these crimes with those that directly inflict "specific injury on individuals." Haddock, 141 Wn.2d at 111. Child molestation is a crime that inflicts specific injury on each individual. See RCW 9A.44.083(1). And attempted child molestation involves taking substantial steps toward accomplishing that criminal objective. RCW 9A.28.020(1).

Canter's argument that his attempt to molest an 8- and 11-year-old girl can only be a crime against the public at large because his victims were fictitious

14

is not persuasive. An attempt conviction stems from "the defendant's 'bad intent' to commit the crime and the fact that had things been as the defendant believed them to be, he or she would have completed the offense." State v. Luther, 157 Wn.2d 63, 73, 134 P.3d 205 (2006). Had the situation been as Canter believed it to be, he would have had sexual contact with an 8-year-old girl and an 11-year-old girl. Crimes affecting more than one victim cannot encompass the same criminal conduct. State v. Lessley, 118 Wn.2d 773, 777, 827 P.2d 996 (1992) (citing State v. Dunaway, 109 Wn.2d 207, 215, 743 P.2d 1237 (1987)). Because Canter intended to inflict specific injury on two different victims, his crimes do not encompass the same criminal conduct.

The panel has determined that the rest of this opinion has no precedential value and should not be published in accordance with RCW 2.06.040.

Impounded SUV

Canter argues the impound of his SUV was "an unreasonable and unconstitutional intrusion into his private affairs" because officers had no probable cause to believe it held evidence of his crime and did not consider "reasonable alternatives" to the impound. He asserts, "All of the evidence found during the search of the car must be suppressed." The State contends Canter waived his challenge to the police impounding his SUV because he did not raise the issue below.

As a general rule, we will not consider a claim of error raised for the first time on appeal unless the defendant shows it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3); State v. Roberts, 158 Wn. App. 174, 181,

15

240 P.3d 1198 (2010) (citing State v. O'Hara, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2010)), remanded on other grounds, 172 Wn.2d 1017, 262 P.3d 64 (2011). The manifest constitutional error exception is a narrow one. State v. WWJ Corp., 138 Wn.2d 595, 602, 980 P.2d 1257 (1999). Without an affirmative showing of actual prejudice, the error is not "manifest" and is not reviewable under RAP 2.5(a)(3). O'Hara, 167 Wn.2d at 99.

An appellant shows actual prejudice when he establishes from an adequate record that the trial court likely would have granted a suppression motion. State v. Abuan, 161 Wn. App. 135, 146, 257 P.3d 1 (2011) (citing State v. Contreras, 92 Wn. App. 307, 312, 966 P.2d 915 (1998)). An alleged error is not manifest if there are insufficient facts in the record to evaluate the contention. State v. Walters, 162 Wn. App. 74, 80, 255 P.3d 835 (2011) (citing State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)).

Impounding a car is a seizure under article I, section 7 of our state constitution. State v. Villela, 194 Wn.2d 451, 458, 450 P.3d 170 (2019) (citing State v. Francisco Reynoso, 41 Wn. App. 113, 116, 702 P.2d 1222 (1985)). Only when an officer impounds a vehicle lawfully is an inventory search of the impounded vehicle authorized. State v. Duncan, 185 Wn.2d 430, 440, 374 P.3d 83 (2016). The burden of establishing a valid inventory search is on the State. State v. Tyler, 177 Wn.2d 690, 698, 302 P.3d 165 (2013) (citing State v. Snapp, 174 Wn.2d 177, 188, 275 P.3d 289 (2012); State v. Vrieling, 144 Wn.2d 489, 492, 28 P.3d 762 (2001)). A police officer may lawfully impound a car whenever

the officer arrests the driver and takes him into custody. RCW 46.55.113(2)(d).

An officer can also seize a vehicle

> (1) as evidence of a crime, when the police have probable cause to believe the vehicle has been stolen or used in the commission of a felony offense; [or] (2) under the "community caretaking function" if (a) the vehicle must be moved because it has been abandoned, impedes traffic, or otherwise threatens public safety or if there is a threat to the vehicle itself and its contents of vandalism or theft and (b) the defendant, the defendant's spouse, or friends are not available to move the vehicle.

Villela, 194 Wn.2d at 459 (quoting Tyler, 177 Wn.2d at 698).

But an impound must also be reasonable to satisfy constitutional requirements. State v. Barajas, 57 Wn. App. 556, 561, 789 P.2d 321 (1990). We determine whether a particular impound is reasonable based on the facts of each case. Roberts, 158 Wn. App. at 184. If available, police must consider reasonable alternatives to impoundment. State v. Hardman, 17 Wn. App. 910, 914, 567 P.2d 238 (1977). Although an officer need not "exhaust all possible alternatives before deciding to impound" a car,

> the officer must show he "at least thought about alternatives; attempted, if feasible, to get from the driver the name of someone in the vicinity who could move the vehicle; and then reasonably concluded from his deliberation that impoundment was in order."

State v. Hill, 68 Wn. App. 300, 306-07, 842 P.2d 996 (1993) (quoting Hardman, 17 Wn. App. at 914).

Canter argues for the first time on appeal that "the police had no lawful basis to impound [his] car" and that "[t]he police did not explore any reasonable alternatives to impoundment, such as asking Canter if a friend or family member could come and take possession of the car." But because Canter did not raise

17

the issue below, the record is silent on why officers impounded Canter's SUV, whether they thought about reasonable alternatives, and whether reasonable alternatives were feasible. Since there are insufficient facts in the record to evaluate Canter's argument, he does not satisfy the manifest error standard for review.

Scope of Search Warrant

Canter contends that officers exceeded the scope of their search warrant when they opened a plastic grocery bag found in a cargo compartment in his car. He argues the items found inside the Albertsons bag were not identified in the warrant or in "plain view" of the officers. We disagree.

Canter does not challenge the trial court's factual findings, so we accept them as verities on appeal. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We review de novo conclusions of law related to the suppression of evidence. State v. Witkowski, 3 Wn. App. 2d 318, 324, 415 P.3d 639 (2018) (citing State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). We also review de novo the constitutional question of whether a search exceeds the scope of a warrant. Witkowski, 3 Wn. App. 2d at 324 (citing State v. Rankin, 151 Wn.2d 689, 694, 92 P.3d 202 (2004)); U.S. CONST. amend IV; WASH. CONST. art. I, § 7.

"Officers with a proper search warrant for premises have the right to seize any contraband which they discover while conducting a search within the scope of the warrant." State v. Burleson, 18 Wn. App. 233, 239, 566 P.2d 1277 (1977). One exception to the warrant requirement is the "plain view" doctrine. State v.

Morgan, 193 Wn.2d 365, 369, 440 P.3d 136 (2019).  The plain view doctrine

applies " 'when the police (1) have a valid justification to be in an otherwise

protected area and (2) are immediately able to realize the evidence they see is

associated with criminal activity.' "  Morgan, 193 Wn.2d at 370 (quoting State v.

Hatchie, 161 Wn.2d 390, 395, 166 P.3d 698 (2007)), cert. denied, 140 S. Ct.

1243, 206 L. Ed. 2d 240, review denied, 195 Wn. 2d 1029, 466 P.3d 784 (2020).

Under the plain view doctrine, if the police are justified by a warrant to search in a

protected area for a specific item and they "happen across some item for which

they had not been searching" but the "incriminating character" of which "is

immediately recognizable," then they may seize that item.  State v. Hudson, 124

Wn.2d 107, 114, 874 P.2d 160 (1994) (citing State v. Myers, 117 Wn.2d 332,

346, 815 P.2d 761 (1991)).  The State must establish the exception to the

warrant requirement by clear and convincing evidence.  Morgan, 193 Wn.2d at

370.

Here, police obtained a warrant authorizing them to search for and seize

the following:

1. Any digital media and digital storage devices, including cell
   phones.

2. Documents, records, communications, images, videos or other
   data that pertain to the above-listed [sex] crime(s) [against
   children], including;

   a. Evidence of use of the device to communicate with
      criminal associates or others about or pertaining to the
      above-listed crime(s), including e[-]mail, instant
      messages, contact lists; [I]nternet use;

   b. Data, documents, records, images, videos, or other
      items in whatever form, tending to identify the owner of

19

the device, the user of the device, and/or the possessor of the device, and/or domination and control of the device.

Canter claims the warrant did not authorize police to open the plastic grocery bag they found inside a cargo compartment in his SUV. And according to Canter, because the items inside the bag were not readily apparent until officers opened the bag, they were not in "plain view." Citing State v. Gonzales, 46 Wn. App. 388, 400, 731 P.2d 1101 (1986), Canter argues that police were not allowed to "move" or "tamper" with the plastic bag to determine whether it contained contraband not readily apparent on sight. In Gonzales, officers obtained consent to search a home for items stolen in a burglary, including a radio and jewelry. Gonzales, 46 Wn. App. at 399. But officers also seized a paper bag that they knew "was too light" to "contain a radio or jewelry and, when lifting it out of the cabinet, could not clearly identify its contents." Gonzales, 46 Wn. App. at 399-400.

Gonzales is distinguishable from this case. Here, the warrant authorized police to search Canter's SUV for electronic devices. Officers did not know whether the plastic bag contained a cell phone or other items identified in the warrant. The bag was located inside the SUV and could hold electronic devices. Just as "a search warrant for a house authorizes a search of containers in the house that could hold one or more of the items specified in the warrant," a search warrant for a vehicle authorizes a search of containers in the vehicle that could hold the items specified in the warrant. See State v. Simonson, 91 Wn. App. 874, 886-87, 960 P.2d 955 (1998). Officers acted within the scope of the warrant

when they opened and looked inside the bag. After opening the bag, they immediately recognized the inculpatory nature of its contents and lawfully seized the items.

Destruction of Evidence

Canter alleges the court should have dismissed his case because police destroyed potentially useful evidence in bad faith. We disagree.

Due process requires the State to preserve and disclose material exculpatory evidence. State v. Wittenbarger, 124 Wn.2d 467, 475, 880 P.2d 517 (1994). But police do not have " 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " Wittenbarger, 124 Wn.2d at 475 (quoting Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)). Dismissal is required only where the State fails to preserve material exculpatory evidence or the defendant shows the police destroyed potentially useful evidence in bad faith. State v. Copeland, 130 Wn.2d 244, 279-80, 922 P.2d 1304 (1996).[10]

"Potentially useful" evidence is " 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' " State v. Groth, 163 Wn. App. 548, 557, 261 P.3d 183 (2011) (quoting Youngblood, 488 U.S. at 57) (citing Wittenbarger, 124 Wn.2d at 477). We review a trial court's ruling on the destruction of

---

[10] "Material exculpatory evidence" must "both possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Wittenbarger, 124 Wn.2d at 475. Canter asserts that the police destroyed potentially useful evidence in bad faith, not that the State failed to preserve material exculpatory evidence.

evidence de novo.  State v. Johnston, 143 Wn. App. 1, 11, 177 P.3d 1127 (2007).

Canter argues that the suspect photograph sent to surveillance officers was "at least potentially useful" because it "showed that the members of the task force believed they were communicating with someone other than Canter." According to Canter, the photograph "might have exonerated [him] had it showed that the police were in fact communicating with a different individual."

Canter inflates the evidentiary value of the photograph.  Detective Rodriguez explained that the task force produced the image in an attempt to identify the person they were communicating with and who the arrest team was about to confront.  While the photograph did not depict Canter, there is little doubt that Canter was the person with whom they were communicating.  The evidence showed Canter was the man who arrived at the am/pm as directed, bought condoms and Tracfone minutes as required by the "mother," bought the girls' favorite candy, and followed the detective's directions to the target house to meet with the children.  Officers found data fragments of the e-mail address Canter used to communicate with detectives on his laptop as well as the phone number he used to contact the mother.  Detective Rodriguez also confirmed Canter's cell phone was the one used to communicate with the mother by sending a "test" text message from the mother's cell phone number to Canter's cell phone after police arrested him.  And Canter matched the physical description he gave of himself in e-mail communications.

Canter fails to explain how testing and examination of the destroyed photograph might have exonerated him given these facts. And Canter could argue his theory that the police were communicating with a different person even without the physical photograph. The State did not dispute that Canter was not the person in the photograph, so the image itself was of little evidentiary value.

Finally, Detective Rodriguez testified that he provided "e[-]mail addresses, telephone numbers, [a] physical description, user names, etc." to task force members in an effort to generate a photograph of the suspect and "utilized law enforcement databases and open-source research techniques in an attempt to identify" him. Detective Rodriguez testified that trying to find an image of a suspect is "a regular part" of the task force's investigations and that "it is not unusual" for the task force to "identify an individual who is not, in fact, the person who ultimately shows up and is arrested." Canter does not explain how Detective Rodriguez's research technique or other information associated with the photograph could exonerate him. The trial court properly denied Canter's motion to dismiss.[11]

Washington Privacy Act

Canter argues that "the interception and recording of [his] text messages" by police violated the WPA. The State responds that Canter implicitly consented to the recordings. We agree with the State.

---

[11] Because we conclude the photograph was not potentially useful, we do not reach the issue of whether police destroyed the evidence in bad faith.

The WPA is violated when " '(1) a private communication[12] transmitted by a device . . . [is] (2) intercepted or recorded by use of (3) a device designed to record and/or transmit (4) without the consent of all parties to the private communication.' " In re Pers. Restraint of Hopper, 4 Wn. App. 2d 838, 845, 424 P.3d 228 (2018)[13] (quoting State v. Roden, 179 Wn.2d 893, 899, 321 P.3d 1183 (2014)); RCW 9.73.030(1)(a). When, as here, the facts are not in dispute, we decide whether a particular communication is private as a question of law subject to de novo review. Townsend, 147 Wn.2d at 673 (citing Clark, 129 Wn.2d at 225).

We presume conversations between two parties intend their communications to be private. Roden, 179 Wn.2d at 900 (citing State v. Modica, 164 Wn.2d 83, 89, 186 P.3d 1062 (2008)). But a communicating party impliedly consents to recording a private conversation when the party uses a device he knows records data. State v. Racus, 7 Wn. App. 2d 287, 299, 433 P.3d 830 (citing Townsend, 147 Wn.2d at 672), review denied, 193 Wn.2d 1014, 441 P.3d 828 (2019).

In Racus, the same task force officers as here posted a nearly identical advertisement in the same Casual Encounters section of Craigslist. Racus, 7

---

[12] "A communication is private (1) when parties manifest a subjective intention that it be private and (2) where that expectation is reasonable." State v. Christensen, 153 Wn.2d 186, 193, 102 P.3d 789 (2004) (citing State v. Townsend, 147 Wn.2d 666, 673, 57 P.3d 255 (2002)).

Factors bearing on the reasonableness of the privacy expectation include the duration and subject matter of the communication, the location of the communication and the potential presence of third parties, and the role of the nonconsenting party and his or her relationship to the consenting party.

Christensen, 153 Wn.2d at 193 (citing State v. Clark, 129 Wn.2d 211, 225-27, 916 P.2d 384 (1996)).

[13] Second alteration in original.

Wn. App. 2d at 291. Racus responded to the "mother" "Kristl's" advertisement and the two exchanged sexually explicit communications by both e-mail and text message. The task force then obtained an intercept authorization and recorded two phone calls and several written communications. Racus, 7 Wn. App. 2d at 291-92. Racus argued that the court should suppress all communications recorded before the intercept authorization because he did not consent to their recording. Racus, 7 Wn. App. 2d at 296. Noting the technological capacities of modern communication devices, Division Two of our court concluded Racus consented to the recording because he "had to understand that computers are message recording devices and that his text messages with 'Kristl' would be preserved and recorded on a computer." Racus, 7 Wn. App. 2d at 300.

The same is true here. Canter had to understand that messages he sent from his laptop or cell phone to another similar device would be recorded. Using passcodes and encryption software to protect recorded data on his devices corroborates his knowledge. By using messaging devices that necessarily record data, Canter implicitly consented to the recording of his conversations.

Canter also argues that we should not apply the "implied consent" doctrine when "police invented the crime and then used a vague advertisement to troll the [I]nternet for men, like Canter, who had never been prosecuted for a crime against children." But our Supreme Court rejected Canter's argument in State v. Athan, 160 Wn.2d 354, 371, 158 P.3d 27 (2007), when it held that lack of awareness that the recipient of a message is a police detective "does not vitiate that consent."

Roden also distinguished private communications involving known contacts from circumstances where "information [is] willingly imparted to an unidentified stranger" or the individual uses a public forum to communicate. Roden, 179 Wn.2d at 903. There, detectives intercepted Roden's communications by posing as Roden's known contact Daniel Lee and using Lee's cell phone to exchange messages with Roden. Roden, 179 Wn.2d at 896. Because the communications came from an established contact number, Roden had a reasonable expectation that he was having a private conversation with Lee. Roden, 179 Wn.2d at 903. Here, Canter did not communicate with an established contact or a "friend or acquaintance" with whom he had an existing relationship as he asserted at oral argument. Instead, he responded to a stranger's post on a website designed to facilitate casual sexual encounters with no strings attached and confined his communications to arranging sex acts.

Canter also cites State v. Hinton, 179 Wn.2d 862, 875, 319 P.3d 9 (2014), arguing that "forcing citizens to assume the risk that they are exchanging information" with an undercover police officer who is recording and saving their text messages "tips the balance too far in favor of law enforcement at the expense of the right to privacy." But Canter cites Hinton out of context. Hinton involved a constitutional challenge under article I, section 7 of the Washington Constitution, while Canter claims a WPA violation. See Racus, 7 Wn. App. 2d at 300 n.6 (recognizing Hinton does not apply to WPA violations). Also, Hinton involved communications with a known contact that the police intercepted, while here, Canter's communications reached their intended recipient. Like Roden,

26

Hinton distinguished communication with a known contact from cases in which defendants "voluntarily disclosed information to strangers and assumed the risk of being 'deceived as to the identity of one with whom one deals.' " Hinton, 179 Wn.2d at 876[14] (quoting Hoffa v. United States, 385 U.S. 293, 303, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966)).

Finally, citing RCW 9.73.230, Canter urges us to apply strictly the WPA's "one-party consent by authorization" procedure to child sex abuse investigations. But because Canter impliedly consented to recording the text and e-mail messages, the WPA does not protect the communications. Canter offers no persuasive authority that we should—or can—interpret the statute to mandate an authorization procedure where the legislature has declined to do so.[15] The trial court properly rejected Canter's challenge to admissibility under the WPA.

Sufficiency of Evidence Supporting a Substantial Step

Canter argues the evidence at trial was insufficient to prove he took a substantial step toward committing any crime because his communications were only "preparation," and he ultimately abandoned his plan when he drove away from the target house. We disagree.

The State must prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). We review a sufficiency of the evidence challenge de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). We must determine whether, after examining the

---

[14] Internal quotation marks omitted.

[15] RCW 9.73.230 addresses "[i]ntercepting, transmitting, or recording conversations concerning controlled substances or commercial sexual abuse of a minor."

27

facts in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. State v. Joy, 121 Wn.2d 333, 338, 851 P.2d 654 (1993); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Such a challenge admits the truth of the State's evidence and all reasonable inferences from it. Salinas, 119 Wn.2d at 201. Circumstantial evidence is as equally reliable as direct evidence. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). And we defer to the fact finder's decision in our review. State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014).

As stated earlier, an attempt to commit a crime requires the defendant to take a "substantial step" toward commission of that crime. RCW 9A.28.020(1). A "substantial step" is conduct "strongly corroborative of the actor's criminal purpose." State v. Aumick, 126 Wn.2d 422, 427, 894 P.2d 1325 (1995). " 'Any slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the individual to commit the crime.' " State v. Sivins, 138 Wn. App. 52, 64, 155 P.3d 982 (2007) (quoting State v. Price, 103 Wn. App. 845, 852, 14 P.3d 841 (2000)). But "mere preparation" to commit a crime is not a substantial step. State v. Workman, 90 Wn.2d 443, 449-50, 584 P.2d 382 (1978). Whether conduct constitutes a substantial step is a question of fact. State v. Wilson, 158 Wn. App. 305, 317, 242 P.3d 19 (2010) (citing State v. Billups, 62 Wn. App. 122, 126, 813 P.2d 149 (1991)).

Canter's actions closely mirror those of the defendants in Townsend, Wilson, and Sivins where the men exchanged sexually explicit communications

with undercover agents posing as young girls, agreed to meet at arranged locations, and brought items to facilitate sexual contact. In Townsend, the defendant corresponded with a police officer acting as a 13-year-old girl named Amber. Townsend, 147 Wn.2d at 670. The two discussed graphic sexual topics. Townsend, 147 Wn.2d at 671. The defendant arranged to meet Amber in a motel " 'to have sex with [her].' " Townsend, 147 Wn.2d at 671.[16] The court found sufficient evidence that the defendant took a substantial step toward attempted rape of a child in the second degree. Townsend, 147 Wn.2d at 679.

In Wilson, the defendant responded to a Craigslist advertisement placed by a police officer posing as a "Mother/Daughter combo." Wilson, 158 Wn. App. at 308. The defendant exchanged photographs with the "mother" and arranged to meet in a restaurant parking lot to have sex with the minor for $300. Wilson, 158 Wn. App. at 309-10. We found sufficient evidence to convict the defendant of attempted second degree rape of a child because he drove to the agreed location and had $300 in cash when police arrested him. Wilson, 158 Wn. App. at 318.

And in Sivins, 138 Wn. App. at 56, the defendant contacted a fictitious 13-year-old girl named Kaylee. Kaylee and the defendant agreed to meet at a motel room for sex, where police arrested the defendant. Sivins, 138 Wn. App. at 57. The court found sufficient evidence to convict the defendant of attempted rape of a child in the second degree because he sent Kaylee sexually graphic messages, said he wanted to have sex with her, drove five hours to meet her,

---

[16] Alteration in original.

and secured a motel room. Sivins, 138 Wn. App. at 61.

Like Townsend, Wilson and Sivins, a reasonable trier of fact could conclude that Canter's e-mail and text communications reflected his desire to have sexual contact with an 8-year-old girl and an 11-year-old girl. He agreed to meet in person for that purpose, followed directions to two specific locations, and brought with him agreed-on items to facilitate sexual contact.

Canter argues that because he ultimately drove away from the target house, his actions were "not strongly corroborative of an intent to have sexual contact with the fictitious minors." But whether Canter ultimately carried out the crime is a separate question from whether he took substantial steps toward that purpose. Canter's actions before arriving at the target house strongly corroborated his intent to have sexual contact with two girls under the age of 12. A reasonable trier of fact could find beyond a reasonable doubt that Canter took substantial steps toward that purpose.

Statement of Additional Grounds for Review

Ineffective Assistance of Counsel

Canter argues that after he drove away from the target house, Deputy Ross used an illegal "PIT Maneuver (Pursuit Intervention Technique)" to trap his SUV, rendering his seizure unlawful. He urges us to find that trial counsel was ineffective for not raising this as a basis to suppress evidence from the traffic stop.

To determine whether counsel was ineffective, we apply the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.

30

Ed. 2d 674 (1984). A defendant must show both deficient performance and prejudice. Strickland, 466 U.S. at 687. We need not "address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

Canter fails to show how the method used by police to seize him was either improper[17] or caused him prejudice. We therefore reject his argument.[18]

Appearance of Fairness

Canter argues he is entitled to reversal because the trial court judge who denied his motion to dismiss had presided over an adoption case in which Canter appeared. We disagree.

Due process requires a fair hearing in a fair court. In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955). A fair hearing requires that the judge not only be impartial, but also that the judge appear to be impartial. State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d 703 (2017).

During his motion to dismiss, Canter's attorney informed the court that the judge had presided over an adoption case involving Canter. The judge told the parties he had no recollection of the case or of Canter's criminal history and "could be fair." Canter did not move for recusal. Canter fails to show error.

---

[17] The record contains no evidence of a "PIT" maneuver. More accurately, Deputy Ross used a different and legal "slow speed pinning" maneuver.

[18] Canter also alleges counsel performed deficiently by not seeking dismissal of his charges because Officer Illyn "questioned Canter [at the arrest scene] without reading him his rights." But Canter does not identify any questions asked by law enforcement before an officer advised him of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We will not search the record for support of claims made in a defendant's statement of additional grounds for review. RAP 10.10(c). We decline to consider this claim.

<u>Trial Evidence</u>

Canter argues the trial court improperly considered previously suppressed evidence at his stipulated bench trial. He claims the trial court improperly considered that he brought candy for the girls when determining his guilt because this information was only discussed during an unlawfully recorded phone call that the court excluded pretrial. But the parties stipulated the court could consider Detective Garden's affidavit in support of the warrant to search Canter's SUV and electronic devices as "agreed documentary evidence" at the bench trial. And in the affidavit, Detective Garden states, "Canter had agreed to get candy for the girls and Tracfone minutes at an AM/PM." Canter cannot now complain that the court improperly considered the agreed evidence.

We affirm Canter's convictions and sentence for two counts of attempted child molestation in the first degree.

_____
Brennan, J

WE CONCUR:

_____          _____